LOUIS W. WOLFF, individually, and LOUIS W. WOLFF and EDWARD A. WOLFF, as executors of last will and testament of Francis Huesmann, deceased, petitioners,

*v.*

THE COMPTROLLER OF THE TREASURY OF THE STATE OF NEW JERSEY.

[Submitted November 6th, 1918.    Decided December 23d, 1918.]

Where a fund was on deposit in a business enterprise and by written document the owner of the fund agreed that the owner of the business should pay him interest in the fund during his life, and at his death the fund should belong to the owner of the business, such fund is not a "gift to take effect at death" within the meaning of the Transfer Inheritance Tax law.

---

On appeal from an assessment of the transfer inheritance tax.

*Messrs. Benny & Cruden,* for the petitioners.

*Mr. John W. Wescott,* attorney-general, and *Mr. Francis H. Magee,* assistant attorney-general, for the state.

BACKES, VICE-ORDINARY.

In levying the transfer inheritance tax on this estate of a resident decedent, the comptroller included in the assessment an

item "Gift to take effect at death, $30,000." The donee and the executors appeal.

Under the third subdivision of section 1 of the Transfer of Property Tax act (*Comp. Stat. p. 5301*), as amended in 1914 (*P. L. 1914 p. 267*), a tax is imposed upon the transfer of a decedent's estate:

> "When the transfer is of property made by a resident, or is of real property within this state, or of goods, wares and merchandise within this state, or of shares of stock of corporations of this state, or of national banking associations located in this state, made by a non-resident, by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor, or intended to take effect, in possession or enjoyment at or after such death."

The gift upon which the tax was levied is in writing and reads:

> "WHEREAS, I, Francis Huesmann, have this day withdrawn from the firm of Huesmann & Co.. which is continued by Louis W. Wolff, my nephew, as sole member thereof; and
>
> "WHEREAS, There is now on deposit with the said firm the sum of thirty thousand 00/100 ($30,000) dollars as a special fund, at the risk of the business;
>
> "Now, therefore, in consideration of the love and affection which I bear him, and in consideration of his paying to me a sum equal to two (2) per centum per annum thereon. in equal semi-annual installments from the date hereof for and during my natural life, I give unto him, said Louis W. Wolff, the above sum absolutely.
>
> "And I, Louis W. Wolff. on my part agree and bind myself to pay the said Francis Huesmann the said two (2) per centum per annum during the term of his natural life, and in the manner above mentioned and to leave the said principal sum in said business at the risk thereof.
>
> "In Witness Whereof, The parties hereto have hereunto set their hands and seals, this first day of March, one thousand nine hundred and sixteen."

The single question for decision is whether the gift was to take effect in possession or enjoyment immediately or at the death of the decedent. By the express terms of the document the sum is given absolutely, but it is the contention of the comptroller that the donee's promise to pay interest and to leave the principal in the business during the lifetime of the donor, post-

poned the enjoyment of the gift until the death of the decedent within the meaning of the statute.

For a better understanding of the true character of the gift we must look to the circumstances that led up to its making. Mr. Huesmann and Mr. Wolff, uncle and nephew, were partners in trade in New York City, under the name of Huesmann & Company, importers of bristles, from 1901 to March 1st, 1916, when the uncle retired, handing the business over to the nephew. They were equal partners save as to $100,000, the uncle's capital in the business at the time he took his nephew into partnership, and the item of $30,000, the subject of the gift. The nephew assumed the payment of the $100,000 and the uncle advanced him $69,000 more to carry on the business. These sums were to be repaid at stated times with four per cent. interest. The $30,000 was a credit to the account of Mr. Huesmann on the confidential ledger of Huesmann & Company, and arose in this manner: Mr. Huesmann succeeded to the business established in 1848 by his grandfather, who at his death had accumulated $61,000, represented by the business. Mr. Huesmann's mother inherited one-half of the estate and she elected that it remain with Huesmann & Company, then the decedent, at four per cent. At her death, in 1896, she bequeathed one-half of the inheritance, estimated by her to be worth $16,- 000, to the decedent, and the other half in trust for four grandchildren, which is still invested in the business of Huesmann & Company. Instead of canceling the debt of his mother *pro tanto* Mr. Huesmann chose to credit the legacy to his account as against the business, and thereafter periodically added interest at four per cent., the rate he had been paying his mother, until he retired, when the accumulations amounted to $31,- 525.50. At the time of the gift $1,525.50 was checked out to him, leaving the net amount of $30,000 to his credit.

The nature of the gift was not alone manifested by the document above set out, but on the day of its execution Mr. Huesmann, in his own handwriting, transferred the credit on the ledger of the firm from his account to that of Mr. Wolff, and delivered to him the book. Thus we have two unequivocal expressions of intention on the part of the donor that the gift should

take effect in possession and enjoyment forthwith. By the formal transfer he gave the sum "absolutely," and the personal entry by the donor in the books of account, destroying forever the evidence of his ownership, accentuates his meaning. It is urged, however, by the comptroller that the promise of the donee to pay interest "and to leave the principal sum in said business at the risk thereof," imports a trust for the protection of the donor, which equity would have enforced, and that, therefore, the gift, though in terms absolute, was in fact conditional, not that it was revocable, but in the sense that this enforceable equity of the donor held the gift in abeyance and prevented the taking effect in possession and enjoyment until the death of the decedent. I am unable to follow the reasoning, logically, to such a result. If the subject-matter of the gift were some tangible asset of the firm delivered into the hands of the donee, something that he could have utilized, there might possibly be merit in the contention, but here the donee was the owner of all that was of the partnership and the thing given, or rather forgiven, was an obligation of the partnership to the donor partner, which he gratuitously surrendered. True, the deeds of gift treat the $30,000 as though the sum were actually on deposit as a special fund with the firm, and available commercially and the argument assumes this to have been the fact, but manifestly that which passed was nothing else than a liability, as between the partners. Upon the uncle's retirement, and upon an accounting, Wolff would have become Huesmann's debtor to the extent of one-half of the $30,000. The gift acquitted him of this and dissolved the debt *instanter*. It would be anomolous if Wolff could hold the debt as against himself—be a debtor to himself.

The comptroller's notion of an implied trust to maintain the donation as capital in the business until the donor's death, and that because of this the enjoyment of the gift was deferred until the decedent's death, altogether loses sight of the nature of the thing given. If we keep before the mind's eye that it was an obligation and not an asset of the copartnership that Huesmann gave to Wolff, the futility of the effort to transform the donee's liability into business capital is at once apparent. There was no trust, and none was intended, and in the very nature of things

the gift came into absolute enjoyment when the debt was handed over to the debtor as a gift. The promise to leave the gift in the business was metaphorical, and, as Mr. Wolff said, to gratify the sentiments of his uncle. The family had for four years invested with the firm of Huesmann & Company all or some parts of the fortune made out of the business by the founder, and though these investments were from time to time paid off, they were carried on the books as a charge against the *business.* This practice of memorializing the success of his grandfather, and, perhaps, his own, the uncle desired to have continued.

Whether the gift was changed into a bargain or sale by the promise to pay interest as the appellants contend, is of no importance to the point at issue. I, however, entertain the view that it did not work a change. I am also of the opinion that the promise was simply an executory and enforceable contract and not a condition of the gift.

I have examined the authorities relied on by the comptroller and find them to be cases in which it clearly appeared that the gifts were not to be enjoyed until after the death of the decedent, or, where from the circumstances, the intent that they should not be was plainly deducible. In the *Matter of Green, 153 N. Y. 223,* the property was assigned to a trustee upon trust to collect the income and apply the same to the grantor's use during life and after his death to distribute the property among the designated remaindermen. In the *Matter of Cornell, 170 N. Y. 423,* the gift was of securities under an agreement that the donor should have during his life "all or such part of the net income of the gift as he might wish." In *In re Orvis Estate, 223 N. Y. 1,* two partners created two funds of $500,000, each upon agreement that the survivors should take the whole. The court held that the transfer upon death to the survivor was in essence and in effect beneficent and donative and similar in nature and effect to transfers by wills. In the *Matter of Dana* (decided by the appellate division of the supreme court of New York), *164 App. Div. 45,* the decedent, owner of corporate capital stock, caused the certificate to be reissued to himself and another person "and the survivor," with the right of revocation. It was held that it was a gift intended to take effect in posses-

sicn at the death of the donor, and hence that the gift was subject to a transfer tax. In *Estate of Reynolds, 169 Cal. 600,* the decedent's father, who was suffering from a mortal disease, four months before his death transferred his department store and its contents, valued at upwards of $100,000, to his son upon the son's agreeing to assume the indebtedness of the business, amounting to about $30,000, and to pay the father $600 per month during his life. It was held that under the provisions of the Inheritance Tax act, imposing a tax upon the transfer of any property,

"When the transfer is of property * * * by deed, grant, bargain, sale, assignment, or gift made *without valuable and adequate consideration,* in contemplation of the death of the grantor, vendor, assignor or donor,"

the undertaking by the son did not constitute a valuable and adequate consideration within the meaning of the act.

The assessment will be revised by striking out the item appealed from.